The attorneys who are going to step forward, please identify yourselves and approximately how much time you wish for argument. Steven Gilbert, I understand we get about 15 minutes and five four to five. Yeah, approximately. We've never cut somebody off unless they start repeating themselves. So I will try not to ever judge for Mr. Schultze. I'd like about 20 minutes. OK. And is it Schultze? It's Schultze Schultze German from Iowa. Thank you. Do you mind if I move this? I may please record. I'm Steven Gilbert of Prescott Rose in Chicago and I represent the appellant defendants ABN Amro and its successor Royal Bank of Scotland for convenience, I'm going to refer to them collectively as ABN Amro. Mr. Schultze's position throughout this case is that he should have received a bonus at least as large as other employees who held his position in earlier years before him. He makes this argument even though there is no specified formula for calculating performances bonuses at ABN during this period. And he makes this argument for ABN and other financial institutions were under siege in 2008 by the worst financial downturn since the Great Depression. It would be a very persuasive argument if the profitability of the bank was an element of Mr. Schultze's bonus. But in 2008, it wasn't. The profitability was not an element, as the court found, of his personal performance. It did not remove the bank's entire discretion in setting a bonus pool for considering the financial circumstances. So they could have said you get nothing. They could have, but they didn't. So indeed, the bank he worked for was in the midst of being sold and was focused on maintenance rather than profit and lost over $500 million in 2008. That had nothing to do with what he did. He did an excellent job and there was no criticism at all in the record with regard to his performance. There was in fact no criticism of his performance. What he did was spectacular considering the size of this transaction and the amount of responsibility that was put on his shoulders, wasn't it? I mean, he was at the top. Actually, this was a tremendously complex transaction, I understand. A couple of transactions. It was, Your Honor. And that was all his doing in that he was the leader of that. He was certainly a leader of that and had an important role in that transaction. But the important part here, Your Honor, is that these are claims, as you know, under the Wage Payment and Collection Act. And both these claims, the claims for a bonus and the claim for severance, suffer from the same flaw. There's no contract or agreement entitling plaintiff to payment of bonus or severance as earned compensation under the act. How do you define contract and agreement? Well, a contract, as you know, Your Honor, the act is designed to have a straightforward application. There needs to be a contract and agreement that allows payment. Contracts and agreements are different because it's in the disjunctive. Correct. And I think agreement is broader. There must be mutual assent by the two parties. And it is broader than a contract and it doesn't require the same formalities and it doesn't afford the same protections. Like there's no inherent obligation of good faith and fair dealing in an agreement as there would be in a contract that's bargained for and has two sides. So for 25 years, he was, approximately 25 years, maybe 23, he was compensated in a certain manner using the SMART and the charts and the interviews with looking at what people in his position before him would have received. And all that went to the wayside for this year. Where in the record is there anything saying that ABM informed him prior to calculating those amounts that this was a new ballgame? Well, I don't think it's so much a new ballgame, Your Honor. I don't know that the process varied so much. It didn't vary? What the complaint was is that the amount at the end varied. Wait a minute. The process didn't vary? Did the individual, his name escapes me right now, cop? Cop. Yeah. Did he look at, he did not look at the compensation of individuals who would have been in the same position a year prior as Mr. Schultz? That is correct, Your Honor. And he did not use the SMART process that the bank had been using? It's not entirely clear to me. Well, it's not there. I mean, right? It's not in the record. But the SMART evaluation itself is not used. Not used. And then there were other factors that were used. I mean, he didn't even know, Mr. Cop didn't even know what those in his position would have received the year before, which was two, three million dollars. And now he's getting $200,000. That's correct, because the ABN manual and Mr. Schultz's own words recognize that the amount of the bonus is discretionary and not set by any agreement. There's no basis in the record, and there's many cases that we've cited, that says what somebody gets in another year, absent an agreed-upon formula that will lead to a number, not that a process that still leads to discretion. There needs to be a formula that leads to a number in order for there to be an unequivocal promise of a bonus, which is what's required under the Act. The formula ABN had used over the past two decades took into account exactly what Justice Hyman was referring to, and that is how much the employee's bonus was the year prior and in prior years, how much the bonus is paid to other employees occupying the same position, both at ABN and across the industry. I mean, that was a practice and agreement they had. I think the fundamental difference is that those were factors that were considered, but they were not factors that led, intuitively, to an answer. Then when you put those factors in front of somebody, they had to decide what the bonus was going to be. There was a bonus pool that was started with. The bonus pool was separated among groups. Does the record reflect the amount of the bonus pool? It doesn't reflect the ultimate amount of the bonus pool, but it reflects that the bonus pool needed to be allocated among people within a group, and people needed to make a decision. There was no... Shouldn't we be troubled by the fact that the record is devoid of any evidence to show how ABN arrived at how much they were going to pay? We don't know. Well, I think that it would be particularly troubling if there was an agreement on a formula and a way it was to be done. If ABN sat in a black box and every year said, Mr. Schultz, we're going to consider a bunch of factors... But that's not the way you did it. As pointed out, for a number of years, counsel, you had used a certain method to compute the bonus that an employee received. And as has been pointed out, in 2008, you deviated. I know you've done it in the past. I think that's a... I think the difficulty with this record is there is no compute. The plaintiff tries to paint the picture that it computes, but I guarantee you that Mr. Pierce would stand up here with a flip chart or a piece of paper that says, here's the formula. This Court and other courts have looked at many, many formulas for calculating bonuses. There is no formula. There is no evidence of the formula. How do you explain this? How do you explain Illinois Administrative Code 56, Section 300.450, which says, Employers and employees may manifest mutual assent by conduct alone, including past practice. So here we have a past practice for decades, and now we say we don't even know what the process was in 2008, but we know what it was for the past two decades. And the Administrative Code even says, past practice. And no one told him. Tell me if I'm wrong. But nobody told him otherwise, and that's why he was shocked. To testify that he was shocked when he got that indication that he received $200,000. A past practice under the RAC would be if somebody came in every year for five years and they got $1,000 for time of service. Where did he get that? I'm saying that would be an example of a past practice. That's your example. In this case, there is no past practice that leads to another. There is a past practice of awarding a bonus. No, there's a past practice of how to arrive at that number. That's the difference from what you're saying. You're saying that unless it's a strict number, that there's no discretion, that the act doesn't apply. Tell me a case that says that. Well, I think, Your Honor, it comes from the act itself. So there's no case? So what you're saying is you're making an argument in which no one is overpowering. No, I don't think so. I think there's a number of cases, Your Honor, that talk about situations where you can't come up with a number, and therefore there was no action under the act. But I think it starts with the statute, because the statute says that wages must be the result of some kind of calculation. And there is no kind of calculation here. Cases involving no formula is in the Chow case. They're all federal court cases, but in Chow, Faulkner, O'Leary, and Hess, all those cases were cases where there was no set formula. There was nothing from which the court could decide what was supposed to get paid. And there are a number of cases in this Court and others that talk about you can't just say, well, he got it last year, so he has to get it this year. And that's really the essence of the argument, is that a different person in different circumstances got a big bonus last year, so I should get one. If that's the rule, this Court will be unindated, as will the Department of Labor, with people that come in and complain and say, you know, there was a process. Joe got $2 million last year. I'd like $2 million this year. Don't you think Mr. Schultz's circumstances are a little unique in terms of what he was asked to do by ABN, take on three different positions, manage the transition with as little risk as possible, disintegrate the operations and the IT platform for both banks? I mean, what he was asked to do isn't your everyday employee coming in and saying, I had a bonus last year of $10,000. I want a $10,000 bonus this year. I do not quibble that Mr. Schultz had a difficult time, and I do not quibble that everything in the record indicates that ABN did it well. But the bottom line is that ultimately Mr. Schultz had always recognized that the issue of how much bonus he was going to get was really in the discretion of ABN. And under the circumstances that faced ABN in that year, he didn't get as big a bonus as he would have liked. Mr. Schultz, he says in an email he wrote in 2009, during my 25-year career at ABN, I had a guaranteed bonus one time. In every other year, I've left it to management and the firm to evaluate my performance and value within the context of the industry, my role, and my peers, trusting the process to deliver a fair compensation award. Now, he's trusting that process to deliver an award. He's not saying to give me the same as somebody else got last year, and he's not saying there's any way to calculate or determine what is the right number. He didn't say that in this case. What you're saying is that you can change the rules with regard to his bonus without letting him know. And the rules were that ABN for a long, long time had done a certain way of calculating the bonus. All of a sudden, in 2008, it's not like it wasn't a pass. And if it was, then show us. But it wasn't. We know that. That's what the evidence shows. So, you know, is that right? If you're a partner in a law firm and you have compensation calculated, your bonus can be based upon discretionary factors, but these are the factors we're going to use. And that's how it's been for 20 years. And then the next year they say, well, no, we're not going to do it. We're not going to work with somebody who's been working 25 years. It doesn't matter anymore. We're going to do this new way without telling you. Your Honor, I think that the law firm example is very telling. Because the law firm example, there's a bunch of factors. Somebody comes to a bonus. You don't say, Joe got axed last year, so I'm entitled to ax this year. And one more point. Yes, you do. In this case, don't make it a hypothetical it's not this case. This case, that's exactly what they did. And they always did it. And he knew it. And he knew it for a year after year after year. So that is part of what they did. If a law firm was similar to this, yes, that's what they would do. Somebody who's managing a department and would always receive a bonus approximately, whatever. And you look at that year after year. Now, if you're not going to look at it, let them know. There's one more point, I think, to the law firm example that's critical. Is the ballgame changes depend on what the law firm made each year. And that process was always in place at ABM, and it was in place in 2008. Everybody agrees that you started with a bonus pool that was established at corporate. The bonus pool was allocated among business units. Sometimes there was a fight about how much went to business units. Then there was an issue about how much money each person in each business unit was to receive relative to each other. And someone came up with a number that was not mathematically determined. So when the money that goes into the system diminished, as it did in this year, the bonuses were all proportionally less. Well, isn't there a bit of a conflict in that RBS, who's the acquiring bank, is determining the bonuses that will be paid to ABN executives? Now, ABN is buying this bank. It can get away with paying less in bonuses, more for us, right? Well, I suppose that's true. We're talking about a year in which somebody lost about $500 million. There wasn't really an issue of more or less. It wasn't Mr. Schulze who lost it. They told him, for 2008, that's not your job. Making a profit is not your job. And so they told him, here's what we want you to do. And he did it. And then when you say, but it was a bad year across the board, you know, they paid McHugh $3 million in 2007, when by the fourth quarter of 2007, it was obvious that the financial services industry was going south. If McHugh had stayed in that job, do you think he would have put up with a $200,000 bonus in 2008? I think he might have been unhappy, as Mr. Schulze was. You know, the difficulty, as I say, from our point of view, Your Honors, is that there is no contract or agreement in this case. And the only contract or agreement that there's a discussion of a process, but the process doesn't lead to a number. And so there is, in fact, Mr. Schulze even testified that, you know, there's been a great deal said about what other people made. Mr. Schulze was never told what anybody else made in the course of the process. He happened to find out what some other people made in another capacity when he was doing some audit work. But the process was never to tell. It may have been in a spreadsheet somewhere, but there has to be a mutual manifestation of intent. So it's one thing for me to say, you know, Joe made $2 million last year on their follow-up process, and hopefully he'll get a good bonus. It's another thing that nobody told him. There was no mutual manifestation between ABN and Mr. Schulze as to what the amount should be. No one told him those prior amounts in a way that would have created a mutual manifestation. I don't think that's the issue, the amount. It's how you get to that amount that is at issue. And that's what the Act talks about, right? There's no doubt that the amount could have been $2 million. It could have been $1.8 million, $2.4 million. I mean, I don't think that – that's not what we're talking about. But, Your Honor, the Act – You're saying that they can just do whatever they want. And they made it one-tenth of what would have been reasonable under the way that ABN had been doing it. The Act is designed to enforce auto-critical promises of a number that's owed to an employee. It is not designed to allow a court to inject itself to decide what's reasonable or what's not. It's very telling that the opinion in this case never says this was the agreed amount or this was the process that led to an agreed amount. She just thought that that amount was unreasonable. There's nothing in the Act that allows you to go to reasonableness. I read Judge Vernon's opinion as saying there isn't any evidence that ABN followed the methodology it had used in the past. The cop is a second-hand employee, didn't know what the methodology was. He didn't care about the methodology. He discounted aspects of the methodology that undeniably had been used in the past. And he arrived at a number according to RBS's deferred policy, which is really irrelevant. So wasn't Judge Vernon just saying, I don't have anything that shows me what the ABN policy would have produced in 2008? The defendants never told me. So I'm going to pick the lowest bonus he could have been entitled to. I think much of that is correct, Your Honor. The problem is the reason that she doesn't have anything that tells what the formula would have led to is there never was a formula that would have led to a number. And that is the fatal flaw in this case. There has never been anything that leads to a number. I don't disagree with Justice Hyman that there is, you know, there may have been a failure in the process. And if there was a failure in the process and there had been a mutual agreement to a process that led to a number, Mr. Schulze would have been entitled to that number under the ABN. But there was a process. But that's where the other side says there was a process. Not that led to a number. Well, you're saying it's got to be an equivocal number. That is, it's a definite number, no discretion involved. That's your position. So either if we don't accept that position, you lose. If the Act says you have no discretion and the Act only applies when there's no discretion, you win. If it's anything less than that, it seems to me you lose. Am I correct? Because you've taken that position. You've said. There may be some modicum of discretion that the policy says these are the factors you consider and this leads to a number. But it needs to lead to a number. There is not a single case that is cited in these briefs that has a situation where the bonus amount is dependent on somebody else's discretion or there is not a formula or something that tells what the bonus should be. I have not found a single case that does that. There are cases where the court says it wasn't good faith to have changed the policy, but the policy was crystal clear. So in the McCleary case, for example, which I know this Court is familiar with, I believe Justice Neville was on the panel. I think in that case, the case says there was a formula. Indeed, in that case, there was a contract. There are other cases where there was a slight change in the date on which you had to be there. But everybody agreed. They knew exactly what the bonus was supposed to be. The add in the definition of age refers to a calculation. And it is consistent with the regulations of the Department of Labor which say that a bonus has to be based on objective criteria that you can walk through. And in this case, those objective criteria simply don't exist. So when the Department of Labor distinguishes, it says a discretionary bonus is when the terms associated with the earning of the bonus are indefinite or uncertain, such as the bonus being upon a positive evaluation of performance and not when the earning of the bonus is based on objective factors, such as length of service, attendance, sign-in, or relocation incentives. This is a case where we don't have objective factors. And in the absence of an objective factor that leads to an answer, there were objective factors in the SMART evaluation. And that would have led to a ranking among people in the group. But it didn't lead to a number. And in the absence of leading to some kind of number, I don't think there's a case that we've seen cited. So your position really is this case should never have gone to trial. That's absolutely true, Your Honor. That's absolutely true. Because that was never done. So if you combine the comment that Mr. Schultz made about a fair process to the actual handbook of AD&MO, which is the only other side of the agreement that he has to rely on, it says this is a discretionary bonus and past years are not considered. Mr. Kopp said he was provided with a written policy from ABN. And now ABN is arguing, well, the written policy was the handbook. He was never asked that in trial, was he? You know, the handbook was introduced at trial. Was Mr. Kopp asked, is this the written policy that you were provided? I do not believe he was. But on the other hand, the handbook was introduced by testimony of an employee who was at the bank from 2000 to 2009. And a stipulation as to authenticity by the plaintiff's counsel. There would be no reason to sit around arguing about whether or not this was the policy that was enforced. Indeed, it doesn't really make any difference ultimately what, and I know Mr. Kopp doesn't like this position, but it really doesn't make any difference what they actually did. What makes a difference is whether there was a mutual manifestation of agreement. And the only agreement that existed prior to 2008 was the ABN handbook. There's no contrary evidence. And the only manifestation that existed is Mr. Schultz knowing about that handbook. He doesn't know about other salary. He doesn't know about anything else. So that's the agreement at issue. And the handbook says it's discretionary and we don't consider past years. So where does Mr. Schultz, they're not influenced by a prior year's bonus. So while you might have looked at what a person in that position had, the handbook is quite clear that that doesn't lead to the number. So with that, where is the mutual manifestation of intent that is required under the act? So I think we've delayed with the key points here. If I could just make one quick point on severance, though I realize it is the tail wagging the dog. With respect to severance, Your Honor, the court's finding, I think, is that it was improper to condition a severance agreement upon a request for a release of the bonus claim. The problem is, with or without that, there was never any agreement with respect to severance. And without an agreement with respect to severance, there's no basis in the act or anywhere else under Illinois law for providing severance, and therefore there is no severance. Thank you very much. Mr. Joyce. Would you like to put the picture back up there? I'd like to. Sorry. Thank you very much. Justices, my name is Ed Joyce, and I represent Robert Schultz. Both at trial and here, the defendants have mischaracterized the nature of Mr. Schultz's claim and misdescribed what Mr. Schultz did to earn the bonus portion of his 2008 compensation. The testimony is undisputed. Even Mr. Kopp agrees that ABM always paid compensation, which was a combination of a fixed salary and a bonus. So the compensation was always at a bonus increment. Now, amazingly, defendants seek to carry off their defense of this claim without calling a single ABM employee. In fact, they never identified an ABM employee who had any information about this claim. The 26A1 employee they tendered, Mr. Stewart, knew nothing about this claim. We expected to see him at trial, but, of course, he was never identified as a trial witness. What's the issue? What's the agreement? I mean, we know there's no contract, but what was the agreement? You say there was an agreement. The agreement is that there's no agreement. The agreement is that ABM would follow the process that had been agreed to by the parties over a long period of time. The process started out with the SMART evaluation. And I'm not smart enough to recall it without turning to my page in the argument. But the SMART evaluation was – it's a protocol. SMART is good for specific, measurable, achievable, and realistic targets. A SMART evaluation protocol was followed every single year. An executive would sit down with his superior, and they would work out the objectives for the year. They would meet throughout the year to see if the objectives were being met. And then if they were met, there would be a report to the executive's file showing he met the criteria. The criteria also had a numbering device. So you would get points based on the extent to which you met the various issues in the SMART formula. Now, the SMART formula includes comparing the compensation of ABM employees in similar positions around the world. So there's nobody who did what Bob Schultz did in 2008. There are people who did what Bob Schultz did in prior years. But in 2008 – So doesn't that then speak to Mr. Guilford's point that there's no number? There's no number we can put our finger on. We've never argued there was a number. I keep telling you that. We've never argued there was a number. There was a process that resulted in a band being agreed to. And the bonus results were in the band. So when you went through the process and you saw other people got paid – Mr. Guilford, I thought, said that Mr. Schultz saw the numbers in connection to something else he was doing. But during the time that he was reviewed, he would not know what those numbers – or the number of the compensation of the person in his position before. The record actually points out that Schultz knew what people in the positions that he took over because he was the chief financial officer of ADM. But before that time, he didn't know? Well, no. There's testimony that he discussed with McHugh what type of bonus he would get when he got his first significant advancement after ceasing to be the chief financial officer. And McHugh told him it would be about a million dollars. And he got about a million dollars. Mr. Joyce was smart coupled with some kind of balance sheet? Yes, sir. The HR department every single year would send a document to the decider, the decider being the person who made the recommendation. So is it your position through the party's conduct they entered into an agreement? Absolutely. There was a process that was followed for 23 years which resulted in a bonus. The process started with SMART. Then at the end of the year, as long as you performed your SMART objectives, the HR department sent your superior a spreadsheet. Now on the spreadsheet was all the data that person would need to know to fix the band of bonus. So he would know what others in your position got elsewhere in the bank. Well, it didn't exist. He would know what other people at other banks like ADM got paid. That was a relative factor. He would know what the person who had your position previously got paid, a relevant factor. Well, let's talk about 2008 then. So if we're looking at what other people in comparable positions both at ABN and otherwise in the industry were paid in 2008, that would be most likely substantially below 2007, right? Actually, no. Because in 2008, Mr. Schultz had three positions, one of which we know from the record paid $3 million in a year. It was not as hectic or as difficult as 2008. In 2008, Schultz was tasked with protecting and preserving $119 billion as part of the largest merger ever that took place in the financial service industry. He was responsible for transferring $21 billion of assets to maybe an AMRO to Bank of America, which he did. He then came back and was responsible for preserving and protecting $96 billion of assets during 2008. The reason that had to be done was simply this. RBS, Santander, and Forrest were the three successful bidders to purchase ABN's assets. They didn't purchase ABN. They purchased the assets. But that closing could not take place until the Dutch regulators and 55 other governmental regulators around the world approved of the sale. That approval did not occur to 2010. So during the process from 2007 to 2010, it was incumbent and was required by the Dutch government that ABN AMRO remain a stand-alone viable bank. So it was Schultz's job to make darn sure those assets were preserved. Now, nobody concedes that after 2007, the notion of considering the profitability of ABN became totally irrelevant. The principal reason for that was not because it was a difficult year. The principal reason for that was it was Schultz's job to be transferring valuable assets. So he was transferring money-making assets, meaning books of business, to RBS, Santander, and Forrest. You can't hold a man responsible for not making a lot of money if he's responsible for transferring the money-making asset elsewhere. Well, the one thing you haven't mentioned is something Mr. Guilford mentioned, which was bonus pool. Well, the bonus pool has to come in here someplace because, sure, the bank has to know. So in this particular year, the bonus pool was a lot less, apparently. How do we know that? Apparently, that's what we were told. Well, we were told that we asked for the documents and never got them. But more importantly, Mr. Guilford... But they say, well, where does the bonus pool come in then? It doesn't come in? At the very end. The problem with that argument is they think the bonus pool comes in in the front. That's preposterous. What happens is the testimony is unrebutted. You go through the SMART process. You then go through the HR process. Your supervisor makes a recommendation to his supervisor. It makes it all the way out to some board that then looks at all the bonus requests and requirements of all the various divisions, and they then set up a bonus pool. They don't set it up first and then have you try and fight for the money. It never happened that way. So there's evidence, and you're saying the record shows the process was otherwise in the front end but in the back. Absolutely. I mean, it makes sense. I mean, why would you ever set up a bonus pool without knowing why a bonus is paid, what's an appropriate bonus, and where does it fit into the scheme of things? So the whole argument that is being put forth by ABM here is a contract argument. As Justice Novell pointed out, they ignore the fact that there's an agreement here. You can have an agreement as well as a contract. But you agree there's a lot of discretion, isn't there? Well, there's a lot of discretion, but as this panel, as this division pointed out in McCleary, where the employer has all that discretion, the employer has to act in good faith and has to act reasonably because that's just the way Illinois law is. That's what McCleary says. That's what this division agrees. So you disagree with the defendant that there has to be an unequivocal number. Well, you pointed out what the administrative code said, and there's also a couple of cases that say it. As soon as the parties reach an agreement on what they're supposed to mutually do, and when the parties perform what they're supposed to mutually do, there's no longer any unequivocal issue. You've earned your bonus. Well, they gave him a bonus. It just wasn't enough that he expected. I'm sure he probably almost fainted when he saw the number. He might have. That was rather shocking. And here, just to give you an idea of how unfair, inappropriate, and uncalled for that bonus was, Schultz, he was paid $1 million to just agree to stay during 2007 and 2008. He was so important to this process that the bank paid him $1 million not based on what he was going to do, just please be there. Be there. So how could somebody who's worth $1 million just to be there get a $200,000 profit? So if they would have looked at his fulfilling the SMART objectives, if they would have looked at the inputs that he had every single year from HR of what his prior person got paid, what his contemporaries got paid elsewhere, they couldn't possibly have paid a $200,000 bonus. Of course, when we asked for that data, we never got it. But we did produce a document that fortunately Mr. Schultz had negotiated when he transferred the assets from ABN to LaSalle that identified who was to keep what documents and for how long. Even though it was the obligation of ABN to keep all these documents related to compensation and bonus, they didn't keep them, couldn't find them. And of course, they're telling a judge who had a business practice, we can't find W-2s from two years ago. We can't find the 941s we give to the government on a quarterly basis. They couldn't even identify the payroll service that paid the payroll. They couldn't identify the people. We asked them, please identify the people you're relying upon for the denials and the answer. They couldn't identify one person. The best they could do was tell us whom they know. And strangely, the person whom they know was either in Hong Kong, Singapore, Bermuda, or we don't know. So when I tried to get a hold of Mr. McHugh, they said, we don't know where Mr. McHugh is. Well, during his evidence deposition, he testified, I was getting a check every month from these people as part of my pension. How could they not know where he was if they gave him a check every month? So I traced them from London to Frankfurt and finally got them in Toronto on Good Friday, the only day he was available to testify. So these people have done everything possible to hide the ball, hide the facts, and then come out and say, well, you failed to prove your case. If they would have followed the process, there would have been a ban within which the bank, in good faith, would have awarded a bonus. In this case, we know for a fact that a person who had one of the prepositions in a less strenuous year got paid a bonus of $3 million. I guess Mr. Guilford's biggest problem is when you refer to a ban, there would have been a ban of available bonuses. And so it's not – it's a process that results in a range that Mr. Schultz would have found acceptable. Well, the range was determined not by Mr. Schultz. It was determined by ABN AMRO. That was a range that Schultz believed in good faith they would award him a bonus within that range, and they didn't. And the testimony was, if you sent out a bonus request and you got back an answer from ABN that we're giving you less money, you'd go back and guess why and try to get some more money. But it was always within the range. So I'd like to switch for a second to the severance issue. All right. We have cited a case that says severance is part of wages. And we've pointed out that ABN AMRO had a severance plan. It's done six of the four that all executive employees qualified to be in. We pointed out in our trial exhibits, I think one through six, the various negotiations that Schultz had with ABN AMRO about the size of his severance. And there were a few errors made in the calculation. And eventually the people he worked with at ABN said, yes, you're right, we made a few errors. And then Schultz said, well, you also want me to give a general release to get my severance. My severance is part of my compensation, part of final pay. And that would be against the Wage Act. But here's what I'll do. I will give you a release, but I'm going to carve out my claim for the 2008 bonus, which was, I think, a big concession on his part. What happened? RBS said no. ABN didn't say no. RBS said no. RBS was clearly calling the shots here. And as the court pointed out, they had a conflict. If they said no, it was normally going to eventually go to them when this deal closed. Now, I don't think there's any question that severance is part of wages, part of final pay. I don't think there's any question under the Act you can't condition receipt of wages or final pay in signing the release. So instead of going through my long presentation, let me just address a few points that were made by Mr. Guilford. The fact that 2008 was a bad year, to me, demonstrates even more what Bob Schulte should have been paid. When someone goes through an incredibly difficult year and preserves the value of $119 billion of assets, that calls for a bigger, not a smaller, bonus. Well, not only that. Profitability of the business was not part of his performance. And that's what he testified. If the answer is that question, right. That's out the window. It's just a question of preservation of assets. And no one suggested he didn't do a great job in that area. Then Mr. Guilford made an amazing comment. He said there's, the case law is, I think we can say clear, but the case law supports the notion that if you are relying on the agreement aspect of the Wage Act as opposed to the contract aspect, you can't make a good faith argument. I've never seen a case that said if the employee is relying on an agreement as opposed to a contract and that his employer has complete discretion within a range, that employer doesn't have to exercise good faith. That would be a startling result. Schultz, he testified about the process, as did Nelson, as did McHugh. Kopp didn't understand it, didn't talk to anybody at all about the process. Then he spoke to Helen Finian, who was another RBS employee. And as the court recognized, she gave him some document that he says he relied upon, but never produced. Going to the employee handbook, the employee handbook was stipulated by plaintiffs as a relevant document. There was not one bit of testimony from any witness that the employee handbook had any relevance at all to the bonus awards to an executive. In fact, Nelson and Schultz, he said, never saw the handbook. Never saw it. Unless you have any more questions, I think you probably understand my position based on your questions. Thank you. Thank you very much. I'm not going to deal with any of the discovery issues. This isn't a discovery case. The key part of this case is the need for an unequivocal promise. The Act requires an employment contract or agreement between the two parties, not with their predecessors, but between the two parties. The regs in 450 say there must be a manifestation of mutual assent by the two parties. And an employee has a right to an unearned bonus where there is an unequivocal promise by the employer. McLaughlin says if there's no unequivocal promise, the employee is not entitled to any part of the bonus pursuant to the Act. And on the basis of calculation is part of that unequivocal promise. There has to be a basis for calculation. There are, in the record, the notion that the bonus premium comes last is simply not consistent with the record. The Q331 says the process began with a decision at the ABN board level as to bonus pool for a particular year. That's after the, what I think Mr. Joyce is saying, is that's after the superiors have recommended the bonuses to the board. But that is not what the record shows. If the Q says it starts with a bonus pool, the bonus pool is then decided among business units. Mr. Schultz supports that at R1 of 90 and of 189 and Mr. McHugh at S331. Then there's the SMART evaluation. And the notion that there wasn't a SMART evaluation is wrong. As we look back at the record, Mr. Schultz prepared Plaintiff's Exhibit 8, and Mr. Kopp testified at R92 to 93 that he saw the SMART objective and went through it. Only after that process do they then look at all SMART objectives for all the people and try to figure out what to do with the bonus pool. McCleary is a good faith case. Mr. Pierce chastised me for suggesting that good faith wasn't part of an agreement. I don't think it is. If you look at the case law, all the case law, it argues that the obligation of good faith and fair dealing is an implied obligation in a contract. And the cases say that an agreement is different than a contract because a contract has various additional protections that are inherent in it. So when the legislature said under the Act that you can have a contract or agreement, you think the legislature meant to say employers who have contracts must act in good faith while employers who have agreements with their employees need not act in good faith? I don't think that went that far. But I do think that all the cases that have been cited are contract cases when they deal with the obligation of good faith. So it's an open issue. And there needs to be, if there's going to be, in all the cases dealed with, set formulas where there is a change to deprive someone of their bonus. And that simply didn't happen in this case. The last point I will make is with respect to the severance plan. The severance plan was expressly conditioned upon the negotiation of a lease. In this case, as we set forth on the brief, there were ongoing negotiations about a whole bunch of things. One of the things, for example, that the plaintiff wanted in the severance agreement was an agreement that his bonus was up. You could see that from the extensive red line that's in the record that we cite. Through the work on the brief, he was entitled to the bonus. There was never any agreement, so there's never any entitlement to severance. I appreciate your time. Thank you. In any case, we'll take it under advisement. All right. Distributors versus labor. Severance severance. Do you have anything you want to respond to that? Thank you. Thanks for your arguments. Excellent arguments and briefs. We'll stand adjourned. We'll be back in a little bit.